UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                              :

WOMEN FOR AMERICA FIRST,             :
                                               :

                            Plaintiff,    :            20 Civ. 5746 (LGS)
                                               :

                 -against-           :            **OPINION AND ORDER**
                                               :

BILL DE BLASIO, *in his official capacity as the* :
*Mayor of New York City, New York*, and POLLY :
TROTTENBERG, *Commissioner of the New York*:
*City Department of Transportation*,         :
                                               :

                              Defendants. :
------------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

       On July 28, 2020, Plaintiff Women For America First filed a Complaint alleging that

Defendants' denial of Plaintiff's request to paint a mural similar to New York City's eight

"Black Lives Matter" murals deprived Plaintiff of its First Amendment rights in violation of 42

U.S.C. § 1983.  Two motions are before the Court.  First, Plaintiff seeks a preliminary injunction

ordering Defendants to permit Plaintiff to paint its own mural, or in the alternative, enjoining

Defendants from painting or maintaining any murals on New York City streets and requiring

Defendants to paint over the eight "Black Lives Matter" murals within seven days of the Court's

ruling.  Second, Defendants move to dismiss the Complaint.  For the reasons explained below,

Plaintiff has standing only to seek a preliminary injunction ordering Defendants to permit

Plaintiff to paint its own mural.  Further, for the reasons explained below, the motion for

preliminary injunction is denied and the motion to dismiss is granted.

## I.     BACKGROUND

### A.     The "Black Lives Matter" Murals

On June 14, 2020, Brooklyn-based artists painted a mural stating "Black Lives Matter"

on Fulton Street in Brooklyn, New York.  Here is an image of the Fulton Street mural:



The artists painted this mural without the government's knowledge, consent or participation.

The Office of the New York City Mayor, Defendant Mayor Bill de Blasio, learned of the mural

on June 15, 2020, and on the same day tweeted,

> JUST IN:  Fulton Street in Brooklyn will share the message that
> #BlackLivesMatter all summer long.  We're making the block pedestrians-only
> and working with the MTA to coordinate nearby transit.

On June 19, 2020, the Black Lives Matter organization and members of the community painted a

second "Black Lives Matter" mural on Richmond Terrace in Staten Island.  The same day, the

Mayor's office tweeted, "We'll paint a Black Lives Matter mural in every borough," and

embedded a Tweet from Mayor de Blasio stating,

> We're not just painting the words #BlackLivesMatter [] on streets across all five
> boroughs -- we're sending a message that these are our values in New York City.

NYC Mayor's Office, @NYCMayor, Twitter (June 19, 2020),

https://twitter.com/NYCMayor/status/1274068537972273152?s=20.  Six additional "Black Lives

Matter" murals were then painted in locations including Joralemon Street, Brooklyn (painted on

June 26, 2020); Centre Street, Manhattan (painted on July 2, 2020); Adam Clayton Powell, Jr.

Boulevard, Harlem (painted on July 8, 2020); Fifth Avenue, Manhattan (painted on July 9,

2020); Morris Avenue, the Bronx (painted on July 15, 2020); and 153rd Street, Queens (painted

on July 30, 2020).  All eight murals (collectively, the "Murals") are painted on city roads open to

traffic.  The New York City government preserved the Murals and played a role in the creation

of the six later murals.  The Complaint alleges, for example, that the New York City Department

of Transportation ("DOT") is responsible for the "Black Lives Matter" mural on Fifth Avenue,

which cost approximately $6,000 in DOT funds.

Defendants have reiterated the government's interest in affirming the value of Black

lives.  In response to the media's questions about the Murals, Mayor de Blasio stated that the

Black Lives Matter movement "transcends any notion of politics," and that "this is about

something much bigger than any one group . . ."  In response to questions about whether Mayor

de Blasio would approve a request to paint a "Blue Lives Matter" mural, a spokeswoman for

City Hall spoke about the importance of the "Black Lives Matter" message, stating, "For all lives

to matter, we must first make clear that [B]lack lives matter."  This, she explained, "is why [the

Mayor's office] approved the [M]urals and met those words with actions."  Mayor de Blasio also

distinguished between the "Blue Lives Matter" request and the Murals, stating,

> The Original sin of the United States of America, slavery, and all of the effects
> over 400 years being brought out in the open in a new way and a chance for this
> country to get it right, to address this problem, to move forward, and it's
> summarized in three words 'Black Lives Matter,' so this is about something much
> bigger than any one group, this is about righting a wrong and moving us all
> forward.

**B.**     **Plaintiff's Application to Paint a Mural with a Different Message**

On July 9, 2020, Plaintiff submitted an e-mail request to Mayor de Blasio to paint a mural stating, "Engaging, Inspiring and Empowering Women to Make a Difference!"  Plaintiff sought to paint its mural on "Fifth Avenue, or another similar street within the city's jurisdiction," including suitable alternatives like the "FDR Drive outside Gracie's Mansion," or "on 42nd Street near Times Square, or even City Hall Park . . ."  Plaintiff did not receive a response. Plaintiff sent a second request via Federal Express, which the Mayor's office received on July 15, 2020.  On August 17, 2020, the DOT denied Plaintiff's second request.  The DOT stated that it "does not permit installations on City roadways that are open to traffic."

New York City does not generally permit private citizens to paint on streets open to traffic.  Under Local Law § 10-117(a),

> *No person shall write, paint or draw any inscription,* figure or mark of any type *on any* public or private building or other structure or any other *real or personal property owned,* operated or maintained *by* a public benefit corporation, *the City of New York* or any agency or instrumentality thereof or by any person, firm, or corporation, or any personal property maintained on a city street or other city-owned property pursuant to a franchise concession or revocable consent granted by the city, *unless the express permission of the owner or operator of the property has been obtained.*

*Id.* (emphasis added).  The Complaint alleges that there is no application process for painting murals or other non-traffic-related messages on New York City streets.  Plaintiff references the New York City Charter, which vests authority in an Art Commission to make decisions with respect to "works of art," including murals.  N.Y.C. Charter, Ch. 37, §§ 851(a), 854(a). According to the New York City Charter,

> *No work of art shall hereafter* become the property of the city by gift or otherwise, or be purchased, commissioned, contracted for, accepted, erected . . . *or be placed on or extend into or over any public street, avenue, [or] highway . . . belonging to the city, unless* such work of art or a design of the same, accompanied by a specification and an estimate of the cost thereof, a plan showing its proposed location, and, if the commission deems it

necessary or desirable, also a model, and any other pertinent information as may be required by the commission including a plan in such detail as the commission may require for the maintenance or conservation thereof, shall first have been submitted to the commission by the agency having jurisdiction, *and such work of art or the design thereof, its location, and the plan for its maintenance or conservation, shall have been approved in writing by the commission*.

*Id*. at Ch. 37, § 854(d) (emphasis added).

## II.    STANDING

### A.    Legal Standard

Plaintiff has standing to bring its First Amendment claim and related request for a preliminary injunction ordering Defendants to permit Plaintiff to paint its own mural; Plaintiff does not, however, have standing to seek a preliminary injunction prohibiting Defendants from painting or maintaining any murals on New York City streets because this remedy would not redress Plaintiff's alleged injury.  Although Defendant does not dispute Plaintiff's standing, "the court has an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009); *see also Coal. for Competitive Elec., Dynergy Inc. v. Zibelman*, 906 F.3d 41, 58 (2d Cir. 2018), *cert. denied sub nom. Elec. Power Supply Ass'n v. Rhodes*, 139 S. Ct. 1547, 1547 (2019).

To establish standing, the plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Moya v. United States Dep't of Homeland Sec.*, 975 F.3d 120, 129 (2d Cir. 2020) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016)).  "Each element of standing must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation."  *Sonterra Capital Master Fund Ltd. v. UBS AG*, 954 F.3d 529, 534 (2d Cir. 2020) (internal quotation marks omitted).  To demonstrate standing for injunctive relief, a plaintiff "cannot rely solely on past injuries; rather,

the plaintiff must establish how he or she will be injured prospectively and that the injury would be prevented by the equitable relief sought." *Marcavage v. City of New York*, 689 F.3d 98, 103 (2d Cir. 2012); *accord Liberian Cmty. Ass'n of Conn. v. Lamont*, 970 F.3d 174, 184 (2d Cir. 2020). An organization has "standing in its own right to seek judicial relief from injury to itself," *Warth v. Seldin*, 422 U.S. 490, 511 (1975), where the organization "meet[s] the same standing test that applies to individuals," *New York Civil Liberties Union v. New York City Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012) (internal quotation marks omitted); *accord Pen Am. Ctr., Inc. v. Trump*, 448 F. Supp. 3d 309, 323 (S.D.N.Y. 2020), *stay granted*, *motion to certify appeal granted*, No. 18 Civ. 9433, 2020 WL 5836419 (S.D.N.Y. Oct. 1, 2020).

> ### B.     Discussion
>
> #### 1.     Injury in Fact

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Moya*, 975 F.3d at 129 (quoting *Spokeo*, 136 S. Ct. at 1547). "The injury-in-fact necessary for standing need not be large; an identifiable trifle will suffice." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Litig.*, 725 F.3d 65, 105 (2d Cir. 2013) (alterations and internal quotation marks omitted); *accord Porsch v. LLR, Inc.*, 380 F. Supp. 3d 418, 425 (S.D.N.Y. 2019). Here, Plaintiff was denied the opportunity to paint its own expressive message on a New York City street. Further, Plaintiff contends that the city's preservation of the Murals constitutes continued viewpoint discrimination against Plaintiff's desired message. This, Plaintiff argues, is a violation of its First Amendment right to freedom of expression in New York City streets. The denial of Plaintiff's second request and related alleged violation of Plaintiff's First Amendment rights is a sufficiently concrete and particularized injury to confer

standing.  *See, e.g., Anderson Grp., LLP v. City of Saratoga Springs*, 805 F.3d 34, 46 (2d Cir. 2015) (denial of a special use permit to construct a residential project constituted an injury in fact); *Melendez v. New York City Dep't of Educ.*, 420 F. Supp. 3d 107, 118 (S.D.N.Y. 2019) (denial of a desired ruling by a government agency constituted injury in fact).

### 2.      Traceability

In addition, a plaintiff must show a causal connection between the injury and conduct at issue.  "[T]he injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."  *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  Here, Plaintiff's alleged injury is traceable to Defendants' denial of Plaintiff's second request to paint a mural stating, "Engaging, Inspiring and Empowering Women to Make a Difference!"

### 3.      Redressability

Plaintiff requests that the Court either order Defendants to allow Plaintiff to paint its own mural or, enjoin Defendants from painting or preserving any murals on New York City streets and require Defendants to paint over the Murals within seven days of the Court's ruling. Because of the standing requirement of redressability, Plaintiff does not have standing to seek to forbid any murals on city streets but does have standing to seek authorization to paint its own mural.  To establish standing, a plaintiff must show that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Libertarian Party of Erie Cty. v. Cuomo*, 970 F.3d 106, 121 (2d Cir. 2020) (quoting *Lujan*, 504 U.S. at 560-61).  Here, only an injunction permitting Plaintiff to paint its mural would redress Plaintiff's injury -- specifically, the denial of Plaintiff's request.  *See, e.g., Deshawn E. by Charlotte E. v. Safir*, 156

F.3d 340, 345 (2d Cir. 1998) (where minor plaintiffs challenged the interrogation practices of a detective squad, injunctive relief prohibiting the use in family court delinquency proceedings, of statements taken by the squad, was likely to redress plaintiffs' injury); *J&J Sports Prods., Inc. v. Patin*, 358 F. Supp. 3d 318, 322 (S.D.N.Y. 2019) (finding that declaratory judgment as to the constitutionality of two statutory provisions was likely to redress plaintiff's injury). Accordingly, the Court has subject matter jurisdiction to adjudicate Plaintiff's First Amendment claim and request for an injunction and declaration that would permit Plaintiff to paint its own mural.

## III.    MOTION FOR PRELIMINARY INJUNCTION

### A.    Applicable Legal Standard

"Ordinarily, to obtain a preliminary injunction against governmental action taken pursuant to a statute, the movant has to demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, [] (3) public interest weighing in favor of granting the injunction," and (4) that "the balance of equities tips in his [or her] favor." *Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020) (internal citations and quotation marks omitted). Where, as here, the proposed injunction "will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits," the movant's burden is heightened. *Id*. at 127-28. "The movant must also: (1) make a *strong* showing of irreparable harm, and (2) demonstrate a *clear or substantial* likelihood of success on the merits." *Id.* at 128 (internal citations and quotation marks omitted) (emphasis added).

Plaintiff seeks, as ultimate relief: (a) declaratory judgment that Defendants' conduct is unconstitutional in violation of Plaintiff's First Amendment rights and 42 U.S.C. § 1983; (b) an injunction enjoining "[D]efendants from continuing to deprive plaintiff of its First Amendment

Rights as guaranteed by 42 U.S.C. § 1983"; (c) an order requiring Defendants "to issue a permit allowing [P]laintiff to paint its expressive message on Fifth Avenue at or near [D]efendant's mural or one of the substantially similar streets [P]laintiff proposed as reasonable alternatives for the same number of days as the 'Black Lives Matter' mural has and will continue to exist on Fifth Avenue"; and (d) attorney's fees and costs.  Plaintiff's motion for preliminary injunction seeks remedies (b) and (c) -- injunctions that would permit Plaintiff to paint its own mural and would prohibit Defendants from violating Plaintiff's First Amendment rights.  Plaintiff's motion for preliminary relief also requires consideration of the merits of Plaintiff's underlying claim that Defendants' conduct violates Plaintiff's First Amendment rights and 42 U.S.C. § 1983.  As a result, Plaintiff seeks "substantially all the relief sought" in this case and must "(1) make a *strong* showing of irreparable harm, and (2) demonstrate a *clear or substantial* likelihood of success on the merits."  *Yang*, 960 F.3d at 127-28.

      **B.**      **Discussion**

          **1.**      **Strong Showing of Irreparable Harm**

"The loss of First Amendment freedoms . . . unquestionably constitutes irreparable injury."  *See New Hope Family Servs, Inc. v. Poole*, 966 F.3d 145, 181 (2d Cir. 2020) (internal quotation marks omitted).  Where the deprivation of First Amendment Rights is at issue, as it is here, "the dominant, if not dispositive, factor" in deciding a motion for preliminary injunction, is the likelihood of success on the merits.  *Id*.

          **2.**      **Clear or Substantial Likelihood of Success on the Merits**

The Complaint alleges that Defendants have violated 42 U.S.C. § 1983.  "Section 1983 is not itself a source of substantive rights but merely provides a method for vindicating federal rights elsewhere conferred."  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quotation marks

omitted).  To establish a § 1983 claim a plaintiff must show that the defendant was "a state actor, i.e., acting under color of state law," when he deprived the plaintiff of a federal right.  *Milan v. Wertheimer*, 808 F.3d 961, 964 (2d Cir. 2015); *accord Asensio v. DiFiore, et al.*, No. 18 Civ. 10933, 2019 WL 4392743, at *8 (S.D.N.Y. Sept. 13, 2019).

Here Plaintiff alleges violations of its rights under the First Amendment, which is "applicable to the States through the Fourteenth Amendment," and "prohibits the enactment of laws 'abridging the freedom of speech.'"  *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (quoting U.S. Const., Amdt. 1).  Protections under the First Amendment are not absolute; "nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Johnson v. Perry*, 859 F.3d 156, 171 (2d Cir. 2017) (internal citation and quotation marks omitted).  "Speech restrictions imposed on [persons on] government-owned property," -- like New York City streets -- are "analyzed under a 'forum-based' approach that divides government property" into categories including, (1) traditional public fora, (2) designated public fora and (3) nonpublic fora.  *Id*. (internal citations and quotation marks omitted).  "The level of judicial scrutiny that must be applied to state actions inhibiting speech varies with the nature of the forum in which the speech occurs."  *Id*.; a*ccord Komatsu v. City of New York*, No. 18 Civ. 3698, 2019 WL 4805904, at *4 (S.D.N.Y. Sept. 30, 2019), *appeal dismissed*, No. 19-3100, 2020 WL 1545854 (2d Cir. Jan. 15, 2020), *reconsideration denied*, No. 18 Civ. 3698, 2020 WL 4586279 (S.D.N.Y. Aug. 10, 2020), and *adhered to on denial of reconsideration*, No. 18 Civ. 3698, 2020 WL 5507098 (S.D.N.Y. Sept. 10, 2020).  In traditional and designated public fora, content-based regulations of speech must be "necessary to serve a compelling state interest," and in nonpublic

fora, content-based regulations of speech must be "reasonable and viewpoint-neutral." *Johnson*, 859 F.3d at 172 (internal citations and quotation marks omitted); *accord Komatsu*, 2019 WL 4805904 at * 4.

For the reasons outlined below, Plaintiff has not demonstrated a clear or substantial likelihood of success on the merits.  The surfaces of New York City streets are nonpublic fora, to which the government may apply reasonable, viewpoint-neutral restrictions.  Further, in light of potential traffic-safety risks, Plaintiff has not shown a substantial likelihood that it will be able to establish that Defendants' denial of Plaintiff's proposed mural was either unreasonable or based on viewpoint.

### i. Violation of Plaintiff's First Amendment Rights:  Traditional Public Fora

The surfaces of public streets are not traditional public fora for the dissemination of private speech.  Plaintiff argues that public streets are public fora that "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009).  Plaintiff accordingly concludes that the government must narrowly tailor any content-based restrictions of speech to serve a compelling government interest. *Id*.

This argument is unavailing.  Plaintiff does not seek to congregate and share messages with the public in New York City streets.  Plaintiff seeks to paint a message *on* New York City streets.  The United States Supreme Court's characterization of a public street as a place of assembly where citizens can communicate, *Summum,* 555 U.S. at 469, is undeniably distinct from an endorsement of the use of the face of a street -- usually reserved for transportation-related guidance -- as a message board for private speech.  This conclusion is underscored by

Local Law § 10-117(a), which prohibits writing, painting and drawing on New York City streets, absent express permission.

> ### ii.   Violation of Plaintiff's First Amendment Rights:  Designated Public Fora

As an alternative argument, Plaintiff contends that, by permitting the Murals, Defendants opened up New York City streets as designated public fora and triggered an obligation to permit similar expression of different viewpoints absent a compelling reason for denial.  A designated public forum "exists where government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose."  *Walker v. Tex. Div., Sons of Confederate Veterans, Inc., et al.*, 576 U.S. 200, 215 (2015) (internal citations and quotation marks omitted).  The government, however, does not create a public forum -- of any variety -- "by inaction or by permitting limited disclosure."  *Id.* (internal citations and quotation marks omitted).  In addition, the government does not create a public forum when it engages in government speech.  *Id.*  (explaining that while courts engage in a "'forum analysis' to evaluate government restrictions on purely private speech that occurs on government property," the analysis does not apply to government speech).

Plaintiff has not shown a substantial likelihood of success with respect to this alternative argument because Plaintiff has not shown that the Murals constitute private -- not government -- speech.  "The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech."  *Summum*, 555 U.S. at 467.  The government is free to "select the views it wants to express."  *Id.* at 467.  In doing so, it does not trigger an obligation to permit similar expression of other viewpoints.  *Id.; see also Matal v. Tam*, 137 S. Ct. 1744, 1757 (2017) (explaining that "[t]he Free Speech Clause does not require [the] government to maintain viewpoint neutrality").  This "freedom in part reflects the fact that it is the democratic electoral

process that first and foremost provides a check on government speech." *Walker*, 576 U.S. at 207; *United Veterans Mem'l & Patriotic Ass'n of the City of New Rochelle v. City of New Rochelle*, 72 F. Supp. 3d 468, 473 (S.D.N.Y. 2014), *aff'd*, 615 F. App'x 693 (2d Cir. 2015). Forum analysis does not apply at all when the government is speaking for itself. *See Summum*, 555 U.S. at 480-81. This freedom afforded to the government does not, however, mean that it can simply "affix[] a government seal of approval," to pass off private speech as government speech. To avoid situations in which the "government could silence or muffle the expression of disfavored viewpoints," the Supreme Court has exercised "great caution before extending [its] government-speech precedents." *Matal*, 137 S. Ct. at 1758 (declining to treat trademark registrations as government speech).

The Supreme Court has identified government speech in three instances: (1) an advertising program for the sale of beef, *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 562 (2005); (2) the acceptance and display of a privately donated Ten Commandments monument in a public park, *Summum*, 555 U.S. at 472; and (3) state approval of specialty license plates, *Walker,* 576 U.S. at 214. *See New Hope Family Servs, Inc.*, 966 F.3d at 173 (citing these cases as the instances in which the Supreme Court has identified government speech). While the Supreme Court has not articulated a clear test for discerning government speech, the court considered a variety of factors in reaching its holdings in *Johanns*, *Summum* and *Walker*. As the Second Circuit explained,

> [i]n the first circumstance, the [Supreme] Court held that the ads were government speech because the message set out in the beef promotions was from beginning to end the message established by the Federal Government.
>
> In the monuments case, many factors indicated that park monuments represented government speech, among them, (a) government's historic use of monuments to speak to the public, (b) a tradition of parks selectively accepting and displaying donated monuments, (c) the public's close identification of public parks with the

government owning the parkland, and (d) the accepted monuments were meant to and had the effect of conveying a government message.

Finally, in the specialty plates case -- described by *Matal* as likely marking the outer bounds of government-speech doctrine -- three factors were determinative: (a) States had long used license plates to convey government messages; (b) the public closely identified license plates with the State because it manufactured and owned the plates, generally designed them, and used them as a form of government identification; and (c) Texas maintained direct control over the messages conveyed on specialty plates.

*New Hope Family Servs., Inc.*, 966 F.3d at 173.

Even privately contributed monuments can constitute government speech.  "Just as government-commissioned and government-financed monuments speak for the government, so do privately financed and donated monuments that the government accepts and displays to the public on government land."  *Summum*, 555 U.S. at 471.  For example, in *Summum*, the Supreme Court found that monuments placed in a public park constituted government speech, even though "many of the monuments were not designed or built by the [c]ity and were donated in completed form by private entities."  *Id.* at 472.  The Supreme Court rejected the premise that a completed work conveys one message -- that of the creator or donor -- and that a government must accept that singular message to engage in government speech.  *Id.* at 474.  Instead, the Court explained that monuments and specifically, text-based monuments, "are almost certain to evoke different thoughts and sentiments in the minds of different observers."  *Id.* at 475.  The Supreme Court further explained that,

the thoughts or sentiments expressed by a government entity that accepts and displays such an object may be quite different from those of either its creator or its donor.  By accepting a privately donated monument and placing it on city property, a city engages in expressive conduct, but the intended and perceived significance of that conduct may not coincide with the thinking of the monument's donor or creator.

*Id.* at 476.

Several of the factors the Supreme Court looked to in *Johanns*, *Summum* and *Walker* apply here.  First, markings on public streets have historically been used as a means for the government to communicate with the public.  Particularly in light of Local Law § 10-117(a), the surfaces of New York City streets are reserved primarily for government communication.  As a result, public street markings are likely to be "closely identified in the public mind with the [government]," *Summum*, 555 U.S. at 472, specifically the DOT.  In addition, the pleadings suggest that Defendants intended the Murals to be government communication.  Tweets from the Mayor's office confirm that suggestion.  For example, the June 15, 2020, Tweet explains that the "Black Lives Matter" *message* will be shared all summer and notes that the Mayor's office intends to make the Fulton Street block pedestrians-only and to coordinate with the MTA regarding transit.  In addition, the June 19, 2020, Tweet explains that Defendants were "not just painting the words #BlackLivesMatter on streets," and instead, were "*sending a message that these are our values in New York City*," (emphasis added).  Finally, Defendants were involved in the creation of, and controlled the content of, the six later murals.  For example, Defendants paid for the mural on Fifth Avenue with DOT funds.  These factors all strongly support the conclusion that the Murals constitute government speech.

The pleadings suggest that this is not an instance in which Defendants have merely affixed a seal of approval to pass private speech off as government speech.  Although Defendants did not create or commission the murals on Fulton Street and Richmond Terrace, the acceptance and preservation of those murals, in combination with Tweets explaining the government's intention to share the message that "Black Lives Matter," suggest that Defendants used these privately donated works to engage in government speech.  *See Summum*, 555 U.S. at 471.  The focus and clarity of Defendants' message help to underscore this point.  *Cf. Matal*, 137 S. Ct. at

1758 (rejecting the premise that federal trademark registrations constituted government speech, in part because together, the registrations were "incoherent babbling" rather than a concerted government message).  Defendants adopted a message of social consequence and disseminated it during a time of social unrest.  Black lives matter.  It is plainly evident that these words -- which affirm the value of Black lives -- have meaning separate and apart from any organizations or movements of the same name.

Plaintiff also contends that Defendants' conduct is an affront to the First Amendment because the "Black Lives Matter" message is political.  Whether the "Black Lives Matter" message has political content is not relevant to the question of whether the Murals constitute government speech.  The fact that an elected official, such as the mayor, might seek to communicate a message that is appealing to voters suggests that the Free Speech Clause is serving one of its intended purposes; "the Free Speech Clause helps produce informed opinions among members of the public, who are then able to influence the choices of a government that, *through words and deeds, will reflect its electoral mandate*."  *See Walker*, 576 U.S. at 207 (emphasis added).  Put simply, appeal to voters does not render the "Black Lives Matter" message private rather than government speech.

Finally, Plaintiff argues that even if the Murals are government speech, they are an impermissible form of government speech because the Art Commission -- not Defendants -- has exclusive authority to permit street murals.  Plaintiff attempts to cast Mayor de Blasio's approval of the Murals as a violation of the separation-of-powers doctrine and abuse of political power.[1]

---

[1] Plaintiff's opening brief includes the argument that Mayor de Blasio did not have authority to approve the Murals, in support of the contention that Defendants were acting under color of state law.  However, Plaintiff's reply brief also appears to rely on this argument as a rebuttal to Defendants' contention that the Murals are government speech.  Without additional elaboration on the law, Plaintiff's reply brief states:  "In the event this Court holds that the murals constitute

Plaintiff's argument overlooks that the City Charter expressly calls for the mayor's involvement with the Art Commission.  N.Y.C. Charter, Ch. 37, § 851(a) (requiring that the mayor or an appointee or representative of his choice shall be a member of the Art Commission).  Further, Plaintiff has not explained how the absence of a formal approval process for the Murals impacts whether Defendants engaged in government speech.  Plaintiff has not identified any First Amendment implications of bypassing traditional routes of approval.

Because the Murals are government and not private speech, and therefore did not open up the surfaces of New York City streets as designated public fora, strict scrutiny does not apply to the denial of Plaintiff's request to paint its own street mural.

### iii.      Violation of Plaintiff's First Amendment Rights:  Nonpublic Fora

The surfaces of New York City's streets are nonpublic fora.  Nonpublic fora are "neither traditionally open to public expression nor designated for such expression by the State." *Johnson*, 859 F.3d 156 at 172.  Street surfaces are traditionally closed to public expression and reserved for transportation-related markings.  In addition, the government has not designated street surfaces for expression; instead, Local Law § 10-117(a) prohibits writing, painting or drawing on streets without express permission.

Plaintiff has not shown a substantial likelihood that it will be able to establish either that the denial of its request to paint a mural was unreasonable or due to the content of Plaintiff's proposed message.  Restrictions on speech in a nonpublic forum are allowed if they are "'reasonable and viewpoint-neutral.'"  *Id.* (citing *Lamb's Chapel v. Center Moriches Union Free School District*, 508 U.S. 384, 392-93 (1993).  Here, Plaintiff has not alleged any facts to suggest

---

government speech, such speech is impermissible as it violates the separation-of-powers doctrine of the U.S. Constitution, N.Y. Const. art. III, § 1; id. art. IV, § 1; id. art VI, § 1 (providing for separation of powers at State level), and the New York City Charter."

that the city denied its request in any part due to the content of its message.  In addition, policies prohibiting the use of streets open to traffic as message boards for private expression are not unreasonable.  Instead, for the reasons outlined below, such policies are designed to protect traffic safety.

### 3.      Public Interest and the Balance of the Equities

In evaluating public interest, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief,' as well as 'the public consequences in employing the extraordinary remedy of injunction.'"  *New York v. United States Dep't of Educ.*, 477 F. Supp. 3d 279, 305 (S.D.N.Y. 2020) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).  Plaintiff's own memorandum of law concedes that an injunction permitting Plaintiff to paint its own mural could have negative effects.  Plaintiff states,

> allowing Plaintiff to paint its mural would likely lead to a deluge of other individuals and organizations painting messages of their own, ultimately flooding NYC streets with distracting artwork that may pose safety risks to the public.  If this were to occur, the City would be forced to close numerous roads allowing the murals to be painted (and to dry), which would interrupt traffic flow and divert the attention of policy and NYC DOT personnel from their ongoing responsibilities. The spectacle of painting large murals would draw large numbers of crowds and participa[nts], thereby increasing the risk of COVID-19 transmission.  Moreover, after the murals are completed and the roads re-open, the large, colorful murals would distract drivers, endangering the lives of those in their vehicles, other vehicles, and pedestrians alike.

The Complaint also alleges that an article in *Forbes* magazine states,

> When drivers proceed along a street, they are at times provided visual cues via painted asphalt surfaces that showcase where the median is, where crosswalks are, and generally is indicative of the curbs and other key roadway features.  The colors of yellow and of white are particularly reserved for these purposes and drivers are accustomed to noting where those painted lines and areas are . . .   A driver might mistakenly interpret a portion of the artistic rendering to be a driving guidance directive and therefore drive improperly, either illegally driving or potentially driving in a means that could endanger themselves and other nearby drivers,

perhaps also jeopardizing pedestrians.  Or, a driver might become distracted by the artistic presentation and thus fail to realize that a car ahead of them is braking suddenly, or that a pedestrian is jaywalking in front of the car.  As such, the driver might plow into another vehicle or ram into a pedestrian as a result of being focused on the art and bereft of attention to the driving situation.  Another possibility is that the painted art has overlapped, obscured, or confounded the intended painted traffic control surfaces.

Plaintiff's descriptions of possible ill effects are enough to find that an injunction permitting Plaintiff to paint a street mural is not in the public interest.  *See, e.g.*, *Mogul Media, Inc. v. City of New York*, No. 16 Civ. 9794, 2017 WL 6594223, at *6 (S.D.N.Y. Dec. 22, 2017), *aff'd*, 744 F. App'x 739 (2d Cir. 2018) (recognizing New York City's interest in "traffic safety"); *Clear Channel Outdoor, Inc. v. City of New York*, 608 F. Supp. 2d 477, 947 (S.D.N.Y. 2009), *aff'd*, 594 F.3d 94 (2d Cir. 2010) (same).

Plaintiff has also proposed, as an alternative to permitting Plaintiff's mural, that the Court grant a preliminary injunction enjoining Defendants from painting or maintaining any mural on city streets.  However, as noted above, Plaintiff lacks standing to pursue this relief as it would not redress Plaintiff's alleged harm.  Specifically, an injunction prohibiting all murals would not remedy the denial of Plaintiff's request to paint a mural stating, "Engaging, Inspiring and Empowering Women to Make a Difference!"  Even if such an injunction would remedy Plaintiff's alleged harm, it is not in the public interest.  Interference with the government's ability to paint or preserve *any* mural on New York City streets could pose serious, potentially unwarranted limitations on the government's ability to communicate with the public.  This factor, in combination with the low likelihood of success on the merits, weighs against Plaintiff's motion for a preliminary injunction.  Accordingly, the motion is denied.

## IV.     MOTION TO DISMISS

### A.     Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the [complaint] pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  It is not enough for a complaint to allege facts that are consistent with liability; the complaint must "nudge [] claims across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.

The court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party, *Montero v. City of Yonkers, New York*, 890 F.3d 386, 391 (2d Cir. 2018), but gives "no effect to legal conclusions," *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017) (quoting *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010)).  In addition, in considering a 12(b)(6) motion, a court may consider "matters of which judicial notice may be taken."  *Hu v. City of New York,* 927 F.3d 81, 88 (2d Cir. 2019) (internal citation and quotation marks omitted).  A plaintiff at the preliminary injunction stage has a "heavier burden" than a plaintiff "bears in pleading the plausible claim necessary to avoid dismissal."  *New Hope Family Servs., Inc.*, 966 F.3d at 165.

### B.     Discussion

Although a plaintiff must make a stronger showing of success on the merits to obtain a preliminary injunction than to survive a motion to dismiss, *id.*, in this case, the merits of the First Amendment claim fail as a matter of law, and not based on the plausibility of any factual

allegations.  Even construed in the light most favorable to Plaintiff, the Complaint, for the reasons stated above, does not support a finding that the Murals constitute private -- rather than government -- speech.  As a result, the Complaint does not support the application of a strict scrutiny analysis to Defendants' denial of Plaintiff's second request to paint a mural and further, does not successfully plead that Defendants violated Plaintiff's rights under the First Amendment.  Accordingly, Defendants' motion to dismiss is granted.

## V.      CONCLUSION

For the reasons stated above, Plaintiff's motion for temporary injunctive relief is denied and Defendants' motion to dismiss is granted.  The Clerk of Court is respectfully directed to close the case.

Dated:  February 18, 2021
New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE

21